```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
                  FORT MYERS DIVISION
```

JANICE ADAMS,

        Plaintiff,

vs.                              Case No.   2:04-cv-335-FtM-33SPC

STEWART'S SLEEP CENTER, INC.,

        Defendant.
_____

### ORDER

This matter comes before the Court on Defendant Stewart's Sleep Center, Inc. d/b/a Matter Brothers Furniture's Motion for Summary Judgment (Doc. # 19), filed on July 1, 2005.  Plaintiff Janice Adams filed a Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. # 36) on July 26, 2005.  Upon review of the Defendant's Motion for Summary Judgment and the Plaintiff's response, this Court finds that summary judgment in favor of the Defendant should be GRANTED.

**I.   STANDARD OF REVIEW**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1989)("One of the principal purposes of the summary judgment rule is to isolate and dispose of

1

factually unsupported claims or defenses. . ."). Entry of summary judgment is appropriate "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. Where there is a "complete failure of proof concerning an essential element of the nonmoving party's case," all other facts presented by that party are rendered immaterial. Id. at 323.

The movant bears the responsibility for demonstrating the basis for the summary judgment motion. Id. A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffrey v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(citing Celotex, 477 U.S. at 324). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003).

If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples *ex rel.* Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988)(citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

**II.  BACKGROUND**

Janice Adams was a customer service representative at Stewart's Sleep Center from September 2000 until her termination in March 2003. (Doc. # 36-1, p. 1). Stewart's is a retail furniture store in Fort Myers, Florida. (Doc. # 19, p. 2). Adams has filed suit against Stewart's in this Court, alleging racial discrimination and retaliation under Title VII. (Doc. # 2, ¶¶ 10, 22). Specifically,

Adams, an African American, alleges that Stewart's required her to submit to drug testing because of her race and color and, as a result, caused her to suffer emotional harm and damage to her reputation. (Doc. # 2, ¶¶ 7-8).  Adams does not allege that Stewart's discriminated against her at any time other than when she was asked to take the drug test.  Adams also alleges that her discharge from Stewart's was in retaliation for her complaints about the company's requirement that she, but not white employees, consent to a pre-employment drug test.  (Doc. # 2, ¶¶ 17-21).

The facts are as follows.  Adams was hired on or about September 26, 2001, at which time she consented to a pre-employment drug test. (Doc. # 19, p. 2).  She was employed without incident until she discovered that white employees had not been subjected to a pre-employment drug test.  (Doc. # 36, p. 1).  Adams identified several white co-workers who had not been subjected to pre-employment testing and another co-worker told her that the company did not test anyone who worked in the front office.  (Doc. # 36, p. 1-2).  Adams asked all of the white employees who were subsequently hired whether they had been tested, each of whom replied in the negative.  (Doc. # 36, p. 2). Adams alleges that all or nearly all of her co-workers in her department were not required to undergo pre-employment drug testing (Doc. # 36, p. 2).[1]  Despite making this claim, Adams does not dispute

---

[1]   Adams makes this allegation in her pleadings; however, during her deposition, Stewart's attorney asked Adams to comment on records showing that Angela Logue, a white front office worker who was hired three weeks after Adams, had been tested.  Adams stated that she was "not disputing Angela's drug test."  (Doc. # 29, p. 112).

that on or about October 19, 2000, Angela Logue, who is white, was hired for the front office and was drug tested. (Doc. # 29, p. 110-11).[2] Adams also admitted that other employees, who Adams verified as white during her deposition, were hired at approximately the same time as Adams and were also subjected to pre-employment drug testing. (Doc. # 29, p. 119-20).[3]

---

The Court notes that Adams also conceded that other white employees were drug tested shortly after she was hired. For example, in her deposition Adams was asked, "So Mr. [Jim] Nardone who is white was also drug tested shortly after you, correct?" Adams responded "[y]es." (Doc. # 29, p. 118). In reference to another employee, Roberta Bickle, Adams was asked, "[a]nd she was drug tested and she was white, correct?" Adams responded "[y]es." (Doc. # 29, pp. 119-20).

When ruling on a motion for summary judgment, the court presumes that the non-moving party's evidence is true and all reasonable inferences must be drawn in the non-moving party's favor. See Shotz, 344 F.3d at 1164. A party opposing summary judgment "may not rely upon general averments, but rather must show that there is a 'substantial conflict in evidence to support a jury question.'" Vickers v. Fed. Express Corp., 132 F. Supp. 2d 1371, 1377 (S.D. Fla. 2000)(citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989)). The Federal Rules require that "the nonmoving party . . . go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citing Fed. R. Civ. P. 56(e)).

In the case at bar, Adams's pleadings allege that her co-workers were not subjected to pre-employment testing. Stewart's met its burden of demonstrating the absence of a genuine issue of material fact on this particular issue through Adams's deposition testimony. In her deposition, Adams agrees with or states that she is "not disputing" proof that plainly refutes her allegation. The burden then shifted to Adams as the nonmoving party to show this Court that there is a substantial conflict in evidence that would support a jury question. Adams has not carried that burden because she does not support her contentions with anything beyond the pleadings.

[2]   See note 1, supra.

[3]   See note 1, supra.

5

Adams, troubled by the fact that she had been required to undergo drug testing when her white co-workers had not, decided to approach her immediate supervisor, Karen Hartley, in June or July of 2002. (Doc. # 29, p. 147-52; Doc. # 19, p. 4). Hartley reacted in surprise, telling Adams that she had not been aware that the other employees were not tested, and she told Adams that she would inform Human Resources of the oversight. (Doc. # 19, p. 4). Adams also approached Gary Matter, one of the five partners in the furniture store chain that owns Stewart's, to seek an explanation for the alleged inconsistency in testing. (Doc. # 36, p. 3). Matter entertained Adams's concerns that she had been singled out, explaining that the employees who had not been tested must have merely "fall[en] through the cracks." (Doc. # 36, p. 4).

After Adams met with her superiors, the company conducted a surprise round of random drug tests for eight employees. (Doc. # 36, p. 4). Adams, along with a list of other employees whom Adams terms "very white," was included in the random test. (Doc. # 36, p. 4). The employees Adams had previously identified as white front office workers who had not been screened were included in the random drug test. (Doc. # 25, p. 42).

In August of 2002, months after complaining to her supervisor and Matter, Adams was promoted to office manager and was given an attendant raise. (Doc. # 19, p. 5). Adams alleges that the promotion and raise were part of a master plan to set her up for termination. (Doc. # 29, p. 166). At the beginning of March, roughly eight months after Adams's promotion, Hartley approached Adams with

6

the concern that Adams was not properly supervising some employees in the front office. (Doc. # 29, p. 154-55). Adams argues that Hartley's concerns were a disguised attempt to make it appear that Adams, who had been given the promoted position of office manager, ought to bear some responsibility as office manager. (Doc. # 29, p. 158). Adams denies that she had any supervisory duties as office manager. (Doc. # 29, p. 15)("I was the office manager on the title only. I performed customer service duties. I never performed any office management duties or responsibilities.").

Adams points to a second incident, this time involving Gary Matter, as evidence of further retaliation. Adams argues that Matter retaliated against her by telling her that she was an excellent employee, asking her if she would like to create a new position for herself, and encouraging her to take some paid time off since she was "such a hard working, dedicated employee." (Doc. # 29, p. 161). In her deposition testimony, Adams explained:

>    MR. GUNTER: So did you feel that the meeting was retaliatory, that meeting Gary Matter had with you, that that was retaliation for your complaining back in June 2002?
>    JANICE ADAMS: Yes, I did.
>    MR. GUNTER: Okay. Why is that?
>    JANICE ADAMS: I had previously had a conversation with Gary Matter about the drug testing incident.
>    MR. GUNTER: Okay.
>    JANICE ADAMS: And he never really addressed it with me again. He came to me to ask me to take time off with pay as if there was a problem with me and wanted me to create other positions in the company for myself. That wasn't a favor to me. That was to get rid of me.

(Doc. # 29, p. 163).

Adams concedes that Matter came to her "as if he was looking out for me and he wanted to let me know that . . . I can see you getting

tired and burned out . . . and he wanted to make sure I was okay and if I needed to take time off I could, with pay." (Doc. # 29, p. 164). Believing "it was part of a well orchestrated plan that was in place" to get rid of her, Adams refused Matter's offers to help. (Doc. # 29, p. 166). Despite the fact that Stewart's employees were not typically given paid time off and Adams had refused Matter's offer of an exception, she subsequently took the rest of that day off and failed to come into the office on two days the next week. (Doc. # 29, p. 168). Matter ensured that Adams was paid for those days. (Doc. # 29, p. 168).

Several days after she returned to the office, members of the office staff were asked individually to meet with Matter in his office. (Doc. # 29, p. 174). Matter brought the employees into his office to talk about a previous incident where a confidential fax was taken from the fax machine. (Doc. # 19, p. 6-7).

Adams's later deposition testimony detailed what occurred on the incident into which Matter was inquiring. Adams stated that a piece of paper had appeared on the fax machine after a Christmas party in December of 2002. (Doc. # 29, p. 186). Another employee, Joyce Smith, found a piece of paper on the fax machine and called it to the attention of Adams and her co-workers, who all looked at the paper and saw that it contained salary information for employees in their office. (Doc. # 29, p. 186-87, 189). Although she knew that the information contained in the fax was confidential, Adams made a copy of the fax, gave it to her co-workers to copy, put the original in a basket on Karen Hartley's desk, and brought her personal copy of the

fax to a co-worker employed in the warehouse and showed it to him, allowing him to make a copy for himself. (Doc. # 29, p. 186-210). Matter came into the office later that day looking for a fax and Adams feigned ignorance. (Doc. # 29, p. 211).

When Matter brought Adams into his office in March, he did not reference the December fax; however, Adams was aware that Matter had spoken to her co-workers the same day about the fax incident. (Doc. # 29, p. 215, 174). Adams states that Matter told her that he would have to let her go, because he was uncomfortable with her and "it just will not work out." (Doc. # 29, p. 215). Before Matter had the opportunity to elaborate, Adams walked out of the office. (Doc. # 29, p. 215). Adams later learned that she was terminated because a co-worker had revealed Adams's role in the fax incident, as well as for her negative attitude. (Doc. # 29, p. 216).

Stewart's alleged that Adams's negative attitude was reflected in several different incidents. The first incident occurred after Adams took the two paid sick days. (Doc. # 29, p. 217). Adams discussed this incident in her deposition:

> MR. GUNTER: Did Frank Sangster ask you a question to the effect, hey, I understand you've been out sick and did you reply, yeah, sick of Matter Brothers? Did you say that?
> ADAMS: You know, I could have. I'm not sure if I did but I'm not going to say I didn't.
> MR. GUNTER: Okay.
> ADAMS: I could have.
> MR. GUNTER: Would you agree with me that that would effect - - that would portray a negative attitude?
> ADAMS: Yes.

(Doc. # 29, p. 217). The other incidents occurred over a period of several weeks and were documented in a March 7, 2003, memorandum (Doc.

9

# 29, Ex. 9). The memorandum recalled that Adams had been hostile to co-workers and customers in the weeks past, and that several salespeople had reported it to Matter. (Doc. # 29, p. 219). A later memorandum, dated March 13, 2003, stated that one of Adams's co-workers went to Karen Hartley, explained that Adams had taken the fax and distributed it, and had made copies. (Doc. # 29, p. 237). The memorandum indicated that March 13, 2003, was the first date that Hartley and Matter were aware of Adams's involvement with the missing fax. (Doc. # 29, p. 237). Then, on or about March 14, 2003, Adams was terminated. (Doc. # 19, p. 9-10).

### III.   ANALYSIS

### Racial Discrimination Claim

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

A plaintiff's Title VII claim may be based on direct or circumstantial evidence of discrimination. Bass v. Bd. of County Commissioners, 256 F.3d 1095, 1103 (11th Cir. 2001). To establish a claim for discrimination based on circumstantial evidence, a plaintiff must make out a prima facie case of discrimination, the framework for which is found in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S.

248 (1981). In this case, Adams offers no direct proof of discrimination, seeking instead to meet her burden through circumstantial evidence.

The McDonnell Douglas framework provides that a plaintiff establishes a prima facie case of discrimination when she demonstrates (1) membership in a protected class, (2) that she was subjected to adverse employment action, (3) that her employer treated her differently from others similarly situated who are not part of her protected class, and (4) that she was qualified for the job or benefit in question. Gillis v. Ga. Dept. of Corrections, 400 F.3d 883, 887 (11th Cir. 2005) (citing Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 842-43 (11th Cir. 2000)).

While there is no bright-line test for what constitutes an adverse employment action, the Eleventh Circuit has held that it "is an ultimate employment decision, such as discharge or failure to hire, or other conduct that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." Gupta, 212 F.3d at 587 (citing Robinson v. City of Pittsburgh, 120 F.3d 1286 (3rd Cir. 1997)(citation and internal marks omitted)). If conduct falls short of being an ultimate employment decision, it "must meet 'some threshold of substantiality.'" Bass, 256 F.3d at 1118 (citing Gupta, 212 F.3d at 587)(citing Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir. 1998))). "[N]ot all conduct by an employer negatively affecting an employee" will rise to the level of an adverse employment action. Davis, 245 F.3d at

11

1238; see also Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 578 (11th Cir. 2000)("Title VII [] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.'" (internal citations omitted)).

When an employee alleges that an employer's action rises to the level of an adverse employment action, the employee "must show a serious and material change in the terms, conditions, or privileges of employment." Davis, 245 F.3d at 1238. The employee's subjective view "of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." Id. at 1239.

When determining whether employees are similarly situated for the purpose of analyzing differential treatment, the plaintiff must demonstrate that she and the comparator are similarly situated "in all relevant respects." Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1091 (11th Cir. 2004). "The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer." Id.

After the plaintiff makes out her prima facie case, a presumption arises that the plaintiff was discriminated against and the defendant bears the burden of demonstrating that there is some "legitimate, nondiscriminatory reason" behind the alleged adverse employment action. Burdine, 450 U.S. at 252-53 (citing McDonnell Douglas, 411 U.S. at 802). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. . . . It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether

12

it discriminated against the plaintiff." Id. at 254. If the defendant carries its burden, "the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. at 253 (citing McDonnell Douglas, 411 U.S. at 804). At all times, the plaintiff retains the ultimate burden of persuading the trier of fact that the defendant discriminated against her. Id. at 253.

In the present case, Adams has established that she is a member of a protected class; therefore, the first element of the McDonnell Douglas prima facie case is satisfied. The next inquiry is whether she was subjected to an adverse employment action. Adams's claim is that she suffered discrimination when she was forced to take the pre-employment drug test; she makes no claim that she was discriminated against at any subsequent time. The Court is not convinced that requiring an employee to take a pre-employment drug test rises to the level of an "ultimate employment decision," nor does the Court believe that Adams has shown that a "serious and material change" in her employment resulted from the requirement that she take the test. Adams consented to the test, passed the test, and was hired. Pre-employment drug testing is a common practice among employers, and an employer has a legitimate interest in ensuring that it does not hire individuals who use illegal drugs. Nothing about the request that she take a drug test in any way altered her pay or her job terms or adversely affected her status as an employee.

Even assuming that the requirement to take a pre-employment drug

test could somehow be characterized as an adverse employment action, Adams has failed to establish the next element of a prima facie case of racial discrimination, which is that her employer treated her differently from others similarly situated who are not part of her protected class.  Adams bases her discrimination claim on the fact that other employees in the front office who where hired before her had not been tested; however, her argument overlooks the fact that white employees whose dates of hire generally coincide with hers, who fit more closely within the definition of similarly situated employees, were  subjected to pre-employment drug screening.  Andrea Logue, who Adams agrees is white and who worked in Adams's department, was hired and tested approximately a month after Adams.  Jim Nardone, also a Stewart's employee, was drug tested after Adams, and Adams verifies that he is white.  The same applies to Roberta Bickle, also white, who was hired shortly before Adams.  Adams can point to only one employee, hired either six or eight months after Adams, who was not drug tested.  It is furthermore not insignificant that when Adams drew it to the attention of her superiors, Stewart's promptly tested the employees who had not previously been subjected to a pre-employment test.  At best, Adams has shown that Stewart's is poorly organized or inconsistent in its drug testing policy since not all of its employees had been tested when Adams was hired; however, she can point to nothing that indicates that she was treated any differently from the employees who were hired around the same time that she was hired.  Because a reasonable jury could not conclude that Adams was treated differently from similarly situated employees, summary

judgment is appropriate.

**Retaliation Claim**

Title VII prohibits an employer from retaliating against an employee who has opposed an unlawful employment practice or alleged that the employer violated Title VII.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that "(1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."  Wideman v. Wal-Mart Stores, 141 F.3d 1453, 1454 (11th Cir. 1998)(citing Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991)).

The definition of an adverse employment action in the context of a retaliation claim is the same as in a discrimination claim.  See supra pp. 11-12.  To succeed in a retaliation claim, the plaintiff need not prevail on the underlying claim of discrimination as long as she had a reasonable, good faith belief that "the employer was engaged in unlawful employment practices."  Little v. United Techs, 103 F.3d 956, 960 (11th Cir. 1997)(citing Rollins v. State of Fla. Dept. of Law Enforcement, 868 F.2d 397, 400 (11th Cir. 1989)); Gupta, 212 F.3d at 586.

In the case at hand, Adams alleges that Stewart's retaliated against her because she complained that she, but not her white co-workers, had been subjected to a pre-employment drug test.  The core issue is whether anything done by Stewart's could be considered a retaliatory adverse employment action.  As evidence of retaliation,

15

Adams points to a promotion and attendant raise that were part of a "well orchestrated plan" to get rid of her. She also believes that she was retaliated against when Matter approached her, told her she was a valuable employee, suggested that she take some paid time off when it was not company policy for an employee to receive such a benefit, and offered to allow Adams to essentially recreate a new position for herself. Finally, she claims to have been discharged in retaliation even though she misappropriated a confidential fax containing salary information, made copies of the fax for herself, gave it to her co-workers so that they could make their own copies as well, took it to a warehouse employee, allowed the warehouse employee to make a copy, and then feigned ignorance when Matter came looking for the fax later that same day.

Adams has provided no support for a legitimate claim of retaliation. A reasonable jury could not conclude that a promotion, a raise in pay, paid time off, and an offer to allow an employee to redesign her job description constituted retaliation. Moreover, Stewart's has offered the fax misappropriation incident and Adams's negative attitude as legitimate, nondiscriminatory reasons for her termination.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

1. Stewart's Motion for Summary Judgment (Doc. # 19) is hereby **GRANTED** as to Adams's racial discrimination and retaliation claims as set forth in Counts I and II of the Complaint (Doc. # 2). The Clerk

16

of the Court is directed to enter judgment for the defendant and close the file.

**DONE** and **ORDERED** in Chambers in Fort Myers, Florida, this <u>30th</u> day of September, 2005.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies:

All Counsel of Record